IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | |
|---|---|
| ESTELLE REEVES & JEFF HUNTER, §<br>Individually, and as Next Friends of §<br>JOHN DOE, a Minor, §<br>§<br>VS. §<br>§<br>TEXAS CITY INDEPENDENT SCHOOL §<br>DISTRICT and MARIO CHAPA §  | C.A. NO. G-06-113 |

### PLAINTIFFS' RESPONSE TO DEFENDANT TEXAS CITY INDEPENDENT SCHOOL DISTRICT'S MOTION FOR SUMMARY JUDGMENT

**TO THE HONORABLE COURT:**

Defendant Texas City Independent School District's ("TCISD") Motion for Summary Judgment should be denied for at least the following reasons:

1. John Doe, a twelve-year old, special needs student, was sexually assaulted, suffering a penetrating injury to his anus, on January 26, 2005. According to Doe, similar assaults had occurred previously.

2. TCISD employee and security guard/hall monitor, Defendant Mario Chapa, plead no contest to "injury to a child," and received eight years deferred adjudication. By his own admission, Chapa was allowed to be alone with John Doe for almost two hours that day; he could go where he wanted, when he wanted, and could return when he pleased.

3. TCISD used security guards/hall monitors to discipline students. At TCISD, a security guard could remove a child from the classroom, and, at his whim, keep the child as long as he wanted, and take the child wherever he wanted. According to one coworker, Defendant Chapa had taken John Doe from the classroom "hundreds of times" to ostensibly go play checkers in an isolated room in the back of the library. Two other co-workers said Chapa had taken Doe from the classroom "ten to twenty" times; Doe was also removed on occasion without even his teacher requesting such action. Importantly, there was absolutely no paperwork required for Chapa to remove a child from the classroom, so no one can be certain how many times such "removals" occurred.

4. **John Doe's behavior began to deteriorate around the same time that Chapa started removing him from the classroom.**

5. **TCISD had no policy prohibiting a hall monitor/security guard like Defendant Chapa from being alone with a special needs child, nor was there a policy restricting where the hall monitor could take a child, or when he should return; there simply was no accountability whatsoever.**

6. **TCISD has been sued twice before for allowing an untrained, support staff member to be alone with a special needs child for long periods of time. Despite the prior suits, and indeed, despite promising to change its policy in one of the prior suits, TCISD failed to do so. TCISD was thus deliberately indifferent to the rights of John Doe.**

7. **TCISD had no policy in place at the time of the assaults requiring a system to track the whereabouts of students while at school. TCISD was thus deliberately indifferent to the rights of John Doe. After this, the third lawsuit, TCISD now has such a policy.**

## I.
## INTRODUCTION

This case is very similar to at least two others that have been before this Honorable Court. John Doe, a twelve-year old, special education, special needs student at TCISD's Levi Fry Intermediate School was sexually assaulted at school by TCISD hall monitor/security guard, Mario Chapa. The last assault, which occurred during a two-hour period when Chapa was alone with Doe on January 26, 2005, was the culmination of repeated and increasingly serious sexual encounters between John Doe and Chapa. These encounters took place in a locked, private room, in the back of the library, which is in a separate building from the location of Doe's main classroom. Plaintiffs sued TCISD under 42 U.S.C. § 1983. TCISD now moves for summary judgment, arguing that Plaintiffs cannot show a violation of § 1983 because Defendant's school board was not deliberately indifferent to a risk of such an assault in the adoption of its policies. Defendant's Motion is meritless, and should be denied.

This Court has ruled against TCISD on two previous summary judgment motions in two other cases, which arose out of two alleged sexual assaults of special needs children by a member of the support staff at TCISD. In the *Williams* case, C.A. NO. G-04-428, this Court was confronted with a situation where a special needs child was left completely alone for a long period of time (at least thirty minutes), with an untrained substitute teacher, with no accountability or supervision whatsoever. No one knew how long the substitute teacher and the child were alone; no one was certain where the substitute teacher and the child were located during their time alone. What was clear, however, was that TCISD had no policy preventing such conduct. In the *Williams* case, and for that matter in the companion case, *Ayres v. Texas City ISD*, C.A. No. G-04-506, school board personnel and staff were questioned repeatedly about the lack of a policy requiring strict accountability of the whereabouts of special needs students while attending school, and lack of a policy prohibiting special needs children from being left alone, unsupervised, for long time periods of time with untrained, uneducated support staff. Indeed, during the settlement of the *Williams* case, the School Board assured the Williams family that there would be policy changes to prevent such an occurrence from happening again, and further that there would never be a situation in the future at TCISD where a special needs child could be alone outside of the classroom, with a staff member, for long periods of time, with no accountability. Exhibit U (Williams affidavit, will be supplemented). Although the Board was intimately and keenly aware of the allegations made in the *Williams* case, it is now clear that the School Board made no policy changes whatsoever following the resolution of both the *Williams* and *Ayres* cases.[1] Exhibit G, deposition of Manuel Guajardo, at pp. 12-14; 18-22; 38.

---

[1] TCISD has now, finally, changed policies. There whereabouts of children are now tracked at the school. Hall Monitors are no longer used as disciplinarians. Staff cannot now, at their whim, take a child from the class room wherever they want, whenever they want, for as long as they want. These changes came too late for John Doe.

3

Back to this case: Defendant's policies that existed at the time of John Doe's assaults demonstrate deliberate indifference to the safety and rights of children, especially those special needs children who are the most vulnerable and the most sought out by sexual predators. TCISD had no policy prohibiting untrained, uneducated support staff like Chapa from being able to remove a child from class, and from taking that child to be alone for long periods of time, wherever Chapa chose to go. Further, TCISD had no policy prohibiting a hall monitor like Chapa from taking a student from the classroom with no required destination; in other words, when Chapa would take Doe or another child out of the classroom to "calm him down," he might return in ten minutes, he might return in thirty minutes, or, as in the case with John Doe on January 26, 2005, he might not return until the end of the school day, two or more hours later. Despite the known risk, which was made crystal clear in the *Williams* case, the failure to adopt adequate policies by TCISD created an environment ripe for a predator like Chapa to assault a helpless child.

In the three-month period before the January 26, 2005 assault, Chapa removed John Doe from the classroom multiple times. During this same time period, John Doe's behavior took a drastic turn for the worse. Something was terribly wrong at TCISD that allowed a child predator like Chapa to take a child from the classroom and have his way with John Doe. Plaintiffs filed this lawsuit to force change at the school, and obtain justice. Plaintiffs respectfully ask this Court to deny Defendant TCISD's Motion for Summary Judgment.

## II.
## MATERIAL FACTS

### The Day in Question.

John Doe was in the AIM class, a class for special needs children. Exhibit I, Statement of Rudolph Gonzalez, at 2; Exhibit J, at 76-78; Exhibit P, at 93. On January 25, 2006, Doe was

4

acting out, and being generally noncompliant. The teacher's aid in the AIM class, Derek King, called the front office by phone to send "security." Exhibit H, Statement of Derik Keiy *[sic]* (King), at 8; 12-13. When the front office at Levi Fry is called to assist with a child, the office then radios for security. Both security guards/hall monitors carry a radio. Either of the two security guards, at their choosing, may respond to the call for assistance. Exhibit P, deposition of Richard Ettredge, at 109-110. According to at least one witness, when the office is called, the child creating the problem is sometimes identified. Exhibit V, deposition of Rosalinda Flores, at 27-28.[2] According to that same witness, when John Doe was removed from the class, Chapa would, more times than not, be the individual who would choose to show up to deal with John Doe. Exhibit V, at 26-27. When a child was removed from class, there was no policy or procedure in place to track the child's whereabouts. Exhibit P, at 111-13; Exhibit L, at 10-11. Indeed, no paperwork or authorization was required to remove a child from class by a staff member. Exhibit A, Statement of Russell Cockrell, at 4-6; Exhibit H, at 15; Exhibit I, at 32; Exhibit P, at 78; Exhibit V, at 23-24.

At around 1:30 p.m., Hall Monitor Chapa responded to the call for assistance and showed up at the AIM classroom. No paperwork was completed, but Chapa and social worker Russell Cockrell took Doe to see the Deputy Sheriff, at the Deputy's office. Exhibit A, Statement of Russell Cockrell, at 4-6; Exhibit H, at 15. Pursuant to an interlocal agreement, the Galveston County Sheriff's office keeps a Deputy Sheriff on staff for security at Levi Fry Intermediate School. Exhibit P, at 58-59. After the Deputy told Chapa that day that he was not able to speak to John Doe, Chapa quickly suggested that he take John Doe to play checkers in the library. Exhibit A, at 7; Exhibit T, at 49-50. The Deputy Sheriff and Cockrell agreed with the

---

[2] When a particular child is identified as being unruly over the radio, this gives Chapa the option of deciding whether he wants to come and deal with that particular child.

suggestion. Chapa then left with Doe at around 1:35 pm. Neither the Deputy nor Cockrell saw Chapa or Doe again until around 3:25 pm, at the end of the school day. Exhibit A, at 7. No paperwork was completed tracking Chapa's taking of Doe from the classroom; no one knew where the two were. Exhibit I, Statement of Rudolph Gonzalez, at 32; Exhibit P, at 78.

The room in the back of the library has a lock on it, and can be locked from the inside. Exhibit A, at 9; Exhibit K, at 64-65. Mario Chapa has a key to the lock. Exhibit S, deposition of Mario Chapa, at 141. At least two employees claim they went to check on Doe and Chapa that day, but could not find them. Exhibit A, at 20; Exhibit H, at 18; Exhibit K, at 16-18; 26. Neither of the employees bothered to follow up to determine Doe or Chapa's whereabouts. Doe's teacher, Rudolph Gonzalez, admitted in his deposition he had "no clue" where Chapa took Doe during that two-hour period on January 25, 2005. Exhibit J, deposition of Rudolph Gonzalez, at 21-22.

Doe testified that Chapa took him to an isolated room in the back of the library, a completely separate building, and sexually assaulted him, as he had several times before. Exhibit O, deposition of John Doe, at 25-31; 33-34; 36; 39-41; 56-61. Chapa himself testified that he did in fact go into the isolated room in the back of the library to play checkers with Doe, but insists that the checker game lasted five minutes at the most. Exhibit S, at 54-56; *see also* Exhibit T, at 27-29. Chapa further admitted that he was with Doe for two hours that day, prior to bringing him back to his class so that Doe could go home, but refused to admit that he was actually alone for any significant amount of time with Doe. At the very end of the school day, Teacher's Aid Rosalinda Flores saw Chapa and Doe together near the library. While walking by, Doe stated to Flores: "Mario is my friend." In response to Doe's comment, Mario Chapa quickly looked at Ms. Flores and said: "I don't know what he is talking about." Ms. Flores

6

thought the exchange was very odd. Exhibit D, Statement of Rosalinda Flores, at 12-14; Exhibit G, at 16; Exhibit K, at 28; Exhibit V, at 18. Looking back on it after the fact, Teacher's Aid Derek King thinks that Mario being gone for two hours with John Doe was "suspicious." Exhibit H, at 18; Exhibit K, at 27.

While at dinner that same night, John Doe disclosed to his Mother and Grandmother that he had been assaulted by Chapa. Exhibit M, at 96-98; Exhibit N, at 117-22. Doe was later examined at UTMB. The examiner found internal hemorrhoids and a history consistent with sexual abuse. Exhibit E. Because of the length of time between the examination and the last assault, the examiner concluded that, although the results of the exam were abnormal and were consistent with sexual abuse, the exam results could also be consistent with symptoms sometimes seen in non-abused children. Exhibit E. During the resulting CPS investigation that occurred later, Doe disclosed that the sexual interactions with Chapa in the isolated room had taken place multiple times over several months. Exhibit F.

### Hall Monitors are used as Security Guards.

Mario Chapa, the individual who assaulted John Doe, was a hall monitor, but was considered by most coworkers to be a security guard, or "like a police officer." Exhibit A, at 16-17; Exhibit B, Statement of Edward Ybarra, at 2; Exhibit D, at 3. Hall Monitors at TCISD at the time were also used as "baby sitters" or disciplinarians. Exhibit A, at 13. (This use has now changed.) The shirt that Chapa was required to wear as a hall monitor/security guard had on the back of it in large letters: "Security Guard." Exhibit B, at 16-17. The security guards at Levi Fry were routinely used to "calm students down" and to redirect students so the students could return to class. Exhibit B, at 3-5; Exhibit D, at 7-8. Rather than do a formal, written referral and send an unruly child to the principal or the deputy sheriff, teachers and aids would instead simply call

the office to have one of the security guards come down to the class to "talk" to the student. Exhibit A, at 14-15; 17. These "talk" sessions would last sometimes five minutes, sometimes twenty to thirty minutes; or sometimes two hours. Exhibit A, at 15; 25; Exhibit B, at 5; Exhibit I, at 9-11; 38. There is no policy or procedure in place requiring the monitoring or tracking of a student once security is called and the child is removed from class; the child's whereabouts, and the length of time the child is away from class, is completely in the hands of the security guard. Exhibit L, at 10-11.

It is undisputed that playing checkers, counseling children, and the like are not within the parameters of hall monitors/security guards at TCISD. Exhibit I, at 17; Exhibit J, at 26; Exhibit P, at 30. The job description of a hall monitor has now been "clarified." Exhibit P, at 48-49.

### Mario Chapa was "very friendly."

Mario Chapa was twenty-two years old at the time of the assaults. Exhibit C. Chapa had no criminal record, and had no experience whatsoever working with children—in fact, prior to TCISD, he had never held a job working around children. Exhibit S, at 163-65. According to Chapa's job application, he took the job at TCISD to "make a difference in kids lives." Exhibit S, at 170-71. Chapa was commonly referred to by the students as "Mario." Exhibit H, at 23; Exhibit K, at 51; 53-54. Witnesses state that Chapa was the "playful type," who would always show up at recess and watch the students, even though that was not his duty assignment. Exhibit H, at 26-29. Like a child himself, Chapa would play games and chase the kids. Exhibit H, at 25-26. Such behavior, according to his coworkers, demonstrated a lack of proper boundaries. Exhibit T, at 9-14; Exhibit V, at 15-17. Chapa was described by co-workers as being "very friendly" to the children. Exhibit H, at 25-26.

**Chapa removed John Doe from the classroom many, many times.**

Although he would not admit it in his deposition, in the three months leading up to the final January 26, 2005 assault, Chapa took John Doe out of the classroom "ten to twenty" times. Exhibit I, at 8; Exhibit A, at 11-12 (stating that Mario had taken children to play checkers "hundreds of times")[3]; Exhibit D, at 5-6; Exhibit O, at 15-17; Exhibit T, at 18; 110-11; Exhibit V, at 20, 25. In addition to the times when a teacher or aid called to have John Doe removed to be "calmed down," Doe testified that there were also times when Chapa would just show up at class, in the absence of any misbehavior by Doe, claiming that the principal or assistant principal wanted to see Doe. Exhibit O, at 25-31; 33-34; 36; 39-41; 56-61. (No policy or procedure prevented this type of removal. Exhibit P, at 126). On those occasions, Chapa was allowed to take Doe out of the class. No one at the school, other than Doe and Chapa, know where the two went during these times, or what they did. Exhibit D, at 7-8; Exhibit T, at 34-35; Exhibit V, at 46-47. Doe has testified that during the times that Chapa would remove him from class, Chapa would take him to an isolated room in the back of the library. This room was in a separate building. Exhibit H, at 24. In that room, Chapa would assault Doe, threaten Doe, threaten Doe's parents, talk about various sex topics with Doe, and do a plethora of other despicable and reprehensible things. Exhibit O, at 25-31; 33-34; 36; 39-41; 56-61; Exhibit E; Exhibit F. During the time frame when Doe was being taken from the class room by Chapa, Doe's parents and teachers noted a drastic change in Doe's behavior. Exhibit M, at 51-54; Exhibit K, at 42.

---

[3] Teacher's Aid, Rosie Flores, testified that Chapa could get into the room in the back of the library without being seen. Exhibit V, at 29-31.

### TCISD had no Policy requiring student accountability or preventing a staff member like Chapa from being left alone with a special needs child for long periods of time.[4]

At the time of John Doe's assaults, the District had no policy requiring the school or teacher to account for the whereabouts of the children under their charge. Exhibit J, at 36-37; Exhibit K, at 30; 74-76. No paperwork was required to remove a child from the class. Exhibit T, at 44. No policy required such. Exhibit T, at 47. (As this Court may recall, the same was true in the *Williams* case. Exhibit Q, at 82-83.) Nor was there a policy preventing a security guard—or any other staff member for that matter—from taking a student out of class without written authorization. Exhibit P, at 125. And, at the time, TCISD had no policy preventing a staff member like Chapa from being left alone for long periods of time with a special needs child—or any child for that matter—without supervision. Exhibit P, at 30-31; 123; Exhibit R, at 52-53. (Again, this was the situation giving rise to the *Williams* case.) Further, the District had no policy prohibiting a support staff member like Chapa from being able to remove a child from class and take him wherever he chose, for as long as he chose. Exhibit J, at 36-37; Exhibit L, at 13-16. Had there been such a policy in place, the assault of January 26, 2005 would not have occurred. Exhibit J, at 36-38; Exhibit K, at 76.[5] Now, after three alleged assaults, and three lawsuits, such policies have been put into place. Exhibit J, at 56-58; Exhibit T, at 45-46.

---

[4] Defendant argues that it is impossible to keep a child from being alone with a support staff member for long periods of time. In support of this contention, Defendant offers the lone example of the school bus driver and the last child left on the bus. Defendant's example is flawed. There is a big difference between a hall monitor being allowed, at his whim, to remove a child from class, and doing whatever he pleases with the child for as long as he pleases as opposed to a bus driver being alone with the last child on the bus while driving the child home. The most obvious difference is that, in the bus driver example, the driver has a set, defined schedule, which is the same everyday; his whereabouts is essentially accounted for minute by minute, and, presumably, the child's parent or caretaker is waiting for the child at home. Conversely, in the present situation, no one at all asked or questioned Chapa's long periods of time spent alone with John Doe. There was no paperwork required for Doe to be removed, and there was no destination, or time frame for the removal. A simple policy prohibiting these types of removals would have not only prevented the tragedy in this case, but would also have prevented the tragedy in the *Williams* case.

[5] Thus, this inadequate or lack of policy was the moving force behind the constitutional violation alleged.

According to AIM teacher, Rudy Gonzalez, the new rule is that, if a child leaves the room, the school ensures that it knows where the student is at all times. Exhibit T, at 46.

The difference between a policy and a procedure can be confusing. See, e.g., Exhibit R, deposition of Mary LeBouef, at 15. Plaintiffs submit that the School Board could easily make policy requiring that, from hence forward, TCISD will ensure that: (1) it knows where students are at all times; (2) written authorization is required to remove a student from class, and (3) no staff member can be alone with a child for extended periods of time, without an approved, legitimate purpose. The Superintendent could then implement such policies in whatever procedural manner he pleased. Indeed, according to at least one witness, the School Board has passed new policies and such policies have been implemented by the Superintendent. Exhibit J, at 56-58.

### TCISD Still Has No Policy Requiring Training in the Detection of Sexual Abuse.

Defendant argues that it had adequate policies in place at the time of the assaults giving rise to this case, and points out to the Court that it does in fact have a policy prohibiting sexual abuse of kids, and a policy requiring training in the reporting of sexual abuse. What Defendant fails to remember is that, in the last case, not one of the staff members who were deposed knew about any such policies. This ignorance of policy was even noted in this Court's opinion in the *Williams* case. *Report and Recommendation, Williams v. Texas City Independent School District & Bobby Kohn,* C. A. No. G-04-428. Notably, many, if not all, of the *Williams* depositions were taken at or after the time of the conduct complained of in this case. Thus, whatever "training" situation the witnesses described as existing at Texas City at the time of their depositions also existed at the time of the assaults complained of in this case. Now, of course, most (but not all) of the witnesses in this case have been quick to state in deposition that they have in fact received

11

training pertaining to sexual abuse. Training staff members to testify in a lawsuit is greatly different from actually training staff members about reporting, detecting, or preventing sexual abuse. Exhibit V, at 39-40 (Ms. Flores does not know when she received any such training, but she made it clear that, if she did receive it, she didn't pay it much attention: "You're tired. You want to get out. I don't recall exactly what they were discussing."); Exhibit L, at 13-14.

Setting aside whether Defendant does in fact have a policy pertaining to the reporting of sexual abuse, or whether Defendant has a policy requiring training in that regard, at the time of John Doe's assault, the District had <u>no policy</u> requiring training in the <u>detection</u> or <u>prevention</u> of sexual abuse of their students.[6] Exhibit Q, at 64; Exhibit W, Woodkins deposition, at 23. In fact, according to TCISD's own Superintendent, as of November 2004, there had been no such training, even though there had been several reports of alleged sexual abuse. Exhibit Q, at 64; *see also* Exhibit X, Thompson deposition, at 109–11; 121-22; Exhibit W, at 25-26; Exhibit Q, at 113-15 (detailing three claims of sexual abuse involving special needs students between 3/31/04 and 11/12/04 – Williams, Ayres and Teague – all three of which are pending before this Court); Exhibit L, at 13-14.[7] Tellingly, the superintendent at TCISD recommends and implements policy, yet he has absolutely no training in the detection or prevention of sexual abuse in children. Exhibit Q, at 35, l. 14-19; Exhibit P, at 79-80.

As stated, Superintendent Ettredge and others <u>now</u> claim that there is training in the detection of sexual abuse at TCISD; however, such testimony is <u>highly</u> suspect in light of

---

[6] Defendant's Superintendent admitted this fact during his first deposition in the *Williams* case; in his deposition in this case, he recanted his prior testimony. Although it appears that Defendant has had one session where sexual abuse **reporting** was discussed, there simply is no policy requiring training in the **detection and prevention** of sexual abuse. Reporting of sexual abuse is a reactive measure; detection and prevention is a proactive measure. Exhibit P, at 51-52.

[7] There is also, according to Superintendent Ettredge, a fifth allegation - a "boy that the mother is asking questions about" whose "behavior has changed this year." Exhibit Q, Ettredge at 45-46. In fact, records produced in discovery by TCISD in the *Williams* case showed that the child's mother was concerned about his "poking his rectum" with his thumb in the "early part of the summer" of 2004 – two to three months after Jane Doe's assault in the *Williams* case.

12

previous depositions. *Compare* Exhibit P, at 4-6; 11-17; 148-51; 157-59 *with* Exhibit Q, at 35; 62-64.[8] Even school board member Mary LeBouef admitted in January 2005—the same month of the last assault in this case—that, other than prohibiting sexual abuse, TCISD had no policies pertaining to the prevention or detection of sexual abuse. Exhibit R, at 10-11.

### No changes to policy were made after the Williams Case; and The School Board apparently delegates its policy making authority to a law firm.

The President of the School Board, Manuel Guajardo, was aware of the allegations made in the *Williams* case, specifically that a special needs child was allowed to be left alone for long periods of time with an untrained staff member. Exhibit G, at 12-14; 18-23. Mr. Guajardo admits that no policy changes were made following the *Williams* case. Exhibit G, at 38-40; Exhibit J, at 78; Exhibit P, at 7. Surprisingly, Guajardo also admitted that he does not require the Superintendent to report to the School Board all incidents of alleged sexual abuse. Exhibit G, at 15-19. This type of "head in the sand" response is indicative of deliberate indifference.

As President of the School Board at TCISD, Mr. Guajardo was wholly unfamiliar with the policies that his Board is charged to make, and whether particular policies even existed. Exhibit G, at 21-22; 29-30; 32; 34-37; 57; 76-77. Indeed, Mr. Guajardo as much admitted that he delegates his policy making authority to a Houston law firm. Exhibit G, at 38-41; 45-46. Interestingly, Guajardo does not believe that Mario Chapa is guilty, because Guajardo believes that he can look at an individual to determine whether that person is a sexual predator. Exhibit G, at 44-45. Finally, Mr. Guajardo admitted that there should be a policy in place requiring accountability of students at all times while at school. Exhibit G, at 54. But Mr. Guajardo does

---

[8] In November 2004, Superintendent Ettredge was asked point blank whether he had received training in the detection of sexual abuse, and whether the staff received such training. He stated "No" to both questions. He now claims that such training occurred in October 2004.

not know if there is such a policy. Exhibit G, at 57. Mr. Guajardo's testimony alone should be sufficient to create a fact issue on the deliberate indifference issue.

**Chapa plead No Contest.**

Mario Chapa plead "no contest" to the charge of "Injury to a Child" and received eight years of probation. Exhibit C; Exhibit S, at 13. Chapa can no longer work around children.

### III.
### TCISD WAS DELIBERATELY INDIFFERENT

Despite at least four allegations of sexual abuse at TCISD, and despite the fact that at least three of those allegations involved claims that TCISD allowed an untrained, support staff member to be alone with a child for long periods of time with no accountability or supervision, TCISD:

1. Made no changes to policy, even though the *Williams* and *Ayres* cases demonstrated that TCISD's policies inadequately protected children;

2. Had no policy requiring training in the detection or reporting of sexual abuse;

3. Had no policy prohibiting untrained, uneducated[9] support staff from being left alone with children for long periods of time;

4. Had no policy requiring the tracking of children's whereabouts during the school day;

5. Had no policy prohibiting a child from being removed from class without a legitimate, approved purpose;

6. Still has not, as a Board, reviewed its policies to ensure they are sufficient to prevent the type of occurrence that has now happened at least three times; and

---

[9] Obviously, there have been multiple accounts of educated teachers molesting students. However, it would seem that one would question why someone who had never worked around kids and had no education or training doing so—like a bait camp worker, or florist delivery boy—would choose to work at a school around young children making much less than he could make elsewhere.

14

7.    Still has no written policy requiring training in the *detection and prevention* of sexual abuse in special needs children, or any children.

TCISD, thorough its Board and Superintendent, was deliberately indifferent to the fact that young, special education, special needs students like John Doe need different, stronger policies to protect them. TCISD's indifference lead to the assault of John Doe. Defendant's Motion should be denied.

## IV.
## CONCLUSION

It is almost incomprehensible that a twenty-two year old hall monitor could, at his whim, take a child from class, and take that child to an isolated room, in another building, and do whatever he wanted with the child, for as long as he wanted. It is unfathomable that it happened repeatedly. It is, frankly, unbelievable that no one at the school, including the child's teachers, would question the whereabouts of the child, and no one would even notice that the child never returned to class until the end of the school day. It borders on criminal that such an occurrence has now happened three times, ruining the lives of three special needs children, and giving rise to three lawsuits. What is more damning is that TCISD's policy, or lack thereof, was explored in detail in the last case, yet no changes were made. Based on the facts of this case, Plaintiffs would submit that there exists sufficient evidence to create a genuine issue of material fact on whether TCISD, through the District's policies and lack of policies, was deliberately indifferent to the rights of John Doe. Plaintiffs have a sound § 1983 claim against Defendant TCISD. Accordingly, Defendant TCISD's Motion for Summary Judgment should be denied.

Respectfully submitted,

### THE BUZBEE LAW FIRM

By: /S/ Anthony G. Buzbee
    ANTHONY G. BUZBEE
    STATE BAR NO. 24001820
    1910 Ice Cold Storage Building
    104 21st (Moody)
    Galveston, Texas 77550
    409-762-5393
    409-762-0538 (FAX)
    www.txattorneys.com

OF COUNSEL:
THE BUZBEE LAW FIRM
PETER K. TAAFFE
State Bar No. 24003029

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this document will be served or has been served on all interested parties in accordance with the Federal Rules of Civil Procedure on the *7th day of May, 2007.* Service on E-Filing Users will be automatically accomplished through the Notice of Electronic Filing; non-Filing Users will be served by certified mail, return receipt requested and/or via facsimile.

Mr. Clay T. Grover
Ms. Kristi Herring
FELDMAN & ROGERS, L.L.P.
5718 Westheimer, Ste 1200
Houston, TX 77057
*Via E-Filing and/or*
*CM RRR 7006 2760 0003 6376 9639*

Mr. Kenneth C. Kaye
LAW OFFICES OF KENNETH C. KAYE
1101 W Main St, Ste P
League City, TX 77573
*Via E-Filing and/or*
*CM RRR 7006 2760 0003 6376 9646*

/S/ Anthony G. Buzbee
Anthony G. Buzbee